# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00484-CV

---

### Dr. Lawrence Broder, M.D. and Round Rock Medical Aesthetics & Urgent Care PLLC d/b/a Beleza Medspa, Appellants

### v.

### Nexstar Broadcast Group, Inc.; KXAN-TV; and Jody Barr, Appellees

---

### FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-000768, THE HONORABLE CATHERINE MAUZY, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellants Dr. Lawrence Broder, M.D. and Round Rock Medical Aesthetics & Urgent Care PLLC d/b/a Beleza Medspa sued appellees Nexstar Broadcast Group, Inc., KXAN-TV, and KXAN investigative reporter Jody Barr for defamation per se, defamation per quod, business disparagement, tortious interference with business relations, and tortious interference with prospective economic advantage. The lawsuit arose out of reporting about complaints filed against Broder with the Texas Medical Board (TMB) and the death of one of appellants' patients. Appellees responded with a motion to dismiss under the Texas Citizens Participation Act (TCPA). *See* former Tex. Civ. Prac. & Rem. Code §§ 27.001-.011.[1] Appellants filed a response

---

[1] This case is subject to the original 2011 version of the TCPA, *see* Act of May 18, 2011, 82d Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961, 961-64 (amended by Act of May 17,

and attached several hundred pages of evidence. Both sides filed objections to some of the evidence. After a hearing on appellees' objections and their motion to dismiss, the trial court signed an order dismissing appellants' claims and sustaining most of appellees' objections, striking several documents in their entirety and striking certain statements in other documents. Several weeks later, the court signed an order awarding appellees $119,752 in attorney's fees and $25,000 in sanctions, and appellants filed motions challenging that order. The court held a hearing on appellants' motions and vacated its initial award of attorney's fees. It later held another hearing on the issue of attorney's fees and then signed a new order awarding appellees $113,510 in attorney's fees and $2,000 in sanctions.

Appellants challenge the trial court's orders granting appellees' motion to dismiss and awarding attorney's fees in seven issues, asserting that the TCPA does not apply, that the trial court's application of the TCPA was constitutionally overbroad, that appellants presented a prima facie case of each of their claims, and that the attorney's fee award was improper. We affirm the trial court's orders granting the motion to dismiss and awarding attorney's fees.

## STANDARD OF REVIEW AND TCPA FRAMEWORK

We construe the TCPA liberally to effectuate its intent of safeguarding and encouraging citizens' constitutional rights to free speech, petition, and association while protecting the right to file a meritorious lawsuit. *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (per curiam); *see* former Tex. Civ. Prac. & Rem. Code §§ 27.002, .011(b). Under the version of the TPCA in place at the time the motion was filed, a party seeking dismissal had the initial burden of showing that the non-movant's "legal action is based

---

2019, 86th Leg., R.S., ch. 378, 2019 Tex. Gen. Laws 684), and we therefore cite to the statutes as they existed when the suit was filed as "former Tex. Civ. Prac. & Rem. Code § __."

2

on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association." Former Tex. Civ. Prac. & Rem. Code § 27.003(a). If the movant made that showing by a preponderance of the evidence, the trial court was required to dismiss the action unless the non-movant established by clear and specific evidence a prima facie case for each element of its claim. *Id*. § 27.005(b), (c); *see Coleman*, 512 S.W.3d at 898; *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding). Even if the claimant put forth a prima facie case, the trial court was still required to dismiss the action if the movant "establishe[d] an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." Former Tex. Civ. Prac. & Rem. Code § 27.005(d). The trial court was to consider "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based," allowing limited relevant discovery on a showing of good cause but otherwise suspending discovery in the legal action until the motion has been decided. *Id*. §§ 27.003(c), .006.

We review de novo whether the movant established by a preponderance of the evidence that the challenged legal action is subject to the TCPA and whether the nonmovant presented clear and specific evidence establishing a prima facie case for each essential element of its challenged claims. *Serafine v. Blunt*, 466 S.W.3d 352, 357 (Tex. App.—Austin 2015, no pet.). The TCPA requires a trial court to award "reasonable attorney's fees" to a successful movant. Former Tex. Civ. Prac. & Rem. Code § 27.009(a)(1); *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016). The determination of reasonableness "rests within the court's sound discretion." *Sullivan*, 488 S.W.3d at 299; *Hawxhurst v. Austin's Boat Tours*, 550 S.W.3d 220, 232 (Tex. App.—Austin 2018, no pet.).

## SUMMARY OF THE EVIDENCE

This proceeding arises out of the July 2017 death of Caitlin Duvall-Hammer following plastic surgery performed by Broder at Beleza Medspa and TMB investigations that eventually led to two complaints filed in the State Office of Administrative Hearings (SOAH). Docket Number 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-MD was filed at SOAH by TMB in August 2017 and arose out of Broder's treatment of a patient in January 2016 and his behavior toward an employee who was stuck by a used needle during a procedure in May 2015. Docket Number 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-MD was filed in March 2019 and arose out of his treatment of Caitlin and four other patients.[2]

Barr's news story, aired on KXAN in mid-February 2018 and posted online, opened with a summary of Caitlin's decision to use Broder for her cosmetic surgery and her death four days later. The news report stated that Caitlin's autopsy report, which took four months to complete, determined that she "developed a toxic shock like-syndrome for which she was hospitalized," that she died four days after her procedure "[d]espite aggressive therapy," and that she died "as a result of complications of a cosmetic surgical procedure," but that the autopsy report did not "indicate how the infection happened or where it could have come from."

Barr reported that at the time of the procedure, Broder was under investigation by TMB for "a separate case from 2016," which alleged violations of the Texas Medical Practice

---

[2] Our review requires a summary of the evidence presented in support of and in opposition to appellees' motion to dismiss, which included: Broder's affidavit and attachments; the SOAH proposal for decision entered in SOAH Docket Number 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-MD; an affidavit by the medspa's executive vice president; Barr's affidavit; written and video versions of the news reports; an affidavit by Laura Duvall, Caitlin's mother; Broder's narrative summary of Caitlin's medical procedure; Caitlin's autopsy report and summary; TMB's first SOAH complaint filed in Docket Number 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-MD; and TMB's SOAH complaint filed in Docket Number 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-MD. Appellants do not challenge the trial court's ruling sustaining many of appellees' objections to appellants' evidence, and we thus do not include any reference to the evidence that was stricken by the court.

Act ("the Act"), *see* Tex. Occ. Code §§ 151.001-170.003, and TMB rules, and that Caitlin's family did not know of the investigation until KXAN told them about it. Barr stated that although TMB had "spent 17 months investigating," "the public had no way to know an investigation was underway," and TMB's complaint against Broder was not made public until one month after Caitlin died. Barr reported that the complaint was filed in March 2016 by a doctor whom Broder had fired and largely arose out of a January 2016 liposuction performed by Broder. After an investigation, Barr reported, TMB staff determined that Broder "failed to 'maintain an adequate medical record,' didn't 'safeguard against potential complications,' and used workers 'not qualified' in the operating room." Barr interviewed the aesthetician who assisted Broder in the liposuction procedure, who said that the patient was in "more pain than any other patient that I've seen," that the patient "lost consciousness" and "turned blue," and that Broder gave the patient "[m]ore medication." The aesthetician continued, "That was his response, just give her some more medication." Barr noted additional TMB allegations that Broder had intimidated a witness and the doctor who filed the complaint, had used deceptive advertising, and had not properly treated a nurse who was stuck with a used needle during another procedure. Barr stated that he had sought comment from Broder, who declined to comment other than to say that the complaint "contains numerous misstatements, assuming facts not in evidence, erroneous conclusions, and taking as truth the comments of former employees and business partners of [Broder] who were terminated and actively involved in civil lawsuits against" Broder. Barr also noted that Broder had filed a motion to have TMB's allegations related to deceptive advertising and the needlestick dismissed. The report then stated that KXAN "has confirmed through sources the TMB is now investigating a second complaint against Broder."

5

Barr's report next turned to the TMB complaint process, noting that "[i]t's not a quick process" and that the law "provides protection for doctors when complaints are filed, only publishing a complaint once the TMB investigates and finds a claim of doctor misconduct has merit." Barr reported that TMB had received more than 51,000 complaints since 2010, that only about a quarter of those complaints led to a formal investigation, and that "doctors under a formal investigation can continue treating patients and performing surgeries without monitoring or oversight by the State, and leaving the public in the dark." Barr stated that it takes almost 300 days for a complaint to be closed, generally through a settlement with TMB, and that if a case goes to SOAH, the process can last another year. Barr quoted TMB's president as saying that if TMB believes a doctor is dangerous, "we're going to act on it immediately," and that TMB must balance public safety against the due process owed to doctors. The news report ended with Caitlin's family saying that although nothing can "bring Caitlin back," they were cooperating with KXAN "for other people. . . . If it helps somebody else, then it's been worth it."

In Barr's affidavit, submitted in support of the motion to dismiss, he averred that in September 2017, KXAN received a "confidential tip that a young patient had died after a recent surgery at Beleza Medspa" but did not identify the patient by name or provide any identifying information, stating only that the doctor "had a pending disciplinary action through" TMB "for other cases." Barr also learned the patient's age and "the date range of death" and began to investigate through public records, eventually identifying Caitlin as the patient. Barr interviewed her family members and former Beleza employees and repeatedly sought Broder's comments. He also reviewed Caitlin's autopsy report, a summary of the autopsy findings, and TMB's initial complaint filed in SOAH Docket Number 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-MD. Barr noted that neither Caitlin nor her family knew that Broder had a complaint pending against him when she

6

underwent her surgical procedure. Barr also stated that he had learned that TMB had filed another complaint against Broder in May 2019, including allegations related to Caitlin's death.

In addition to researching Caitlin's case, Barr averred, he "performed significant research into [TMB's] complaint adjudication process," conducting interviews and analyzing five years of complaints and other information "to ascertain how long other medical misconduct investigations take before they become public." Barr and KXAN "spent months" on the report, and each allegation "was thoroughly researched and substantiated through records of official proceedings, publicly available documents, responses to public information requests, official documents and interviews." Barr believed his reporting was "about a highly newsworthy event"—TMB's complaint process, "the nearly 300-day period that it takes" to close an average complaint, "and the fact that the complaints are unavailable to the public while they are pending." Barr concluded by saying, "I believed then that the Reports were true, based on what I believe to be truthful, reliable information." Based on his research and interviews, he "did not have any doubt as to the truth of the report at issue." He concluded by saying, "At the time the Reports were broadcast and published, I believed in the truth of the statements contained therein," and denied harboring any ill will or spite toward Broder or Beleza Medspa.

Caitlin's mother, Laura Duvall, provided an affidavit stating that she obtained a copy of Caitlin's autopsy summary, dated July 28, 2017, which stated, "At autopsy, this woman had all the signs of sepsis . . . . If she is septic, then an argument could be made that her death is due to post-op complications of the procedure. I am sure the doctor will dispute that though." Caitlin's autopsy issued several months later, and Laura said it found that Caitlin "was in a '[t]oxic shock-line clinical state in [the] days following [the] procedure," that she had "developed a toxic shock-like syndrome" within days of the cosmetic procedure; and that she "died as a

7

result of complications of a cosmetic surgery procedure." Laura averred that she and Caitlin were unaware of any pending complaints against Broder at the time of surgery, that Laura had since learned that one complaint had been filed "months (and potentially more than a year)" before Caitlin's surgery, that she would have begged Caitlin not to have the procedure if she had known about the allegations in the complaint, and that she was "confident that [Caitlin] would not have undergone the procedure had she known of the Complaint" against Broder.

The record reflects that at least four complaints were filed with TMB against Broder between January 2016 and February 2018. One was dismissed prior to an investigation for lack of specific substantiating evidence; one went to a formal TMB investigation that resulted in the case being closed with a finding that Broder had not violated the Medical Practices Act; and two went to formal investigations and led to the filing of TMB's complaints with SOAH.

TMB's original SOAH complaint, filed in August 2017 in Docket Number 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-MD, arose out of a complaint filed by Dr. David Dellinger in March 2016. In its complaint, TMB alleged that "Patient One" was told to take five Ativan before her liposuction procedure in January 2016. When the patient "began grimacing and complaining that it felt like the instrument was rubbing against her bones," Broder gave her "another Ativan and an unspecified amount of Hydrocodone," then gave her "an undocumented seventh Ativan" when she continued to complain of worsening pain. Patient One began to shiver and say she felt cold, so Broder gave her "an undocumented eighth Ativan" and instructed the assisting aesthetician to give Patient One "more Tumescent fluid." The aesthetician told Broder that they were out of the fluid and had never used so much on a single patient, Broder left the room, and Patient One "began shivering uncontrollably and turned blue." The aesthetician rushed out to get Broder, who "administered an undocumented medication" and soon terminated the procedure. TMB

8

alleged that Broder had violated the rules governing medical providers by giving Patient One "an excessive amount" of Ativan, failing to adequately document the medications administered to her, abandoning her during the procedure, failing to adequately supervise his "midlevel providers," and allowing "an unauthorized third-party in the operating room." TMB further alleged that Broder had intimidated the aesthetician by threatening to sue her if she made a statement. "Patient Two" was an employee of Broder's who was stuck with a used needle during a procedure. TMB alleged that Broder lacked or did not follow a post-exposure needlestick protocol; did not offer Patient Two medical assistance, an incident report, or additional post-exposure bloodwork after an immediate blood test; and berated her about the incident in a public area of the spa, thus disclosing her protected health information to patients and other staff members in violation of HIPAA.[3] TMB sought penalties for Broder's use of an excessive amount of Ativan with Patient One, failure to obtain her adequate informed consent, failure to maintain adequate medical records, and failure to establish and maintain a needlestick procedure.

Two administrative law judges (ALJs) heard TMB's complaint in SOAH Docket Number 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-MD in October and November 2018 and issued a Proposal for Decision in May 2019. The ALJs referenced TMB's First Amended Complaint, which alleged that Broder had violated the Act and TMB rules by: doing an inadequate pre-operative evaluation of Patient One, failing to record his pre-operative findings, and failing to adequately document medications given to the patient during surgery, her status during the procedure, and the complications she suffered; and through his disclosure of Patient Two's medical information when he berated her in front of staff and patients and his failure to obtain her blood sample for testing, send her to the

---

[3] The Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996).

9

hospital, obtain blood tests at several intervals, offer her antiviral drugs, obtain her informed consent, maintain adequate treatment records, develop a treatment plan, perform an examination of or obtain a medical history from her, test the blood of the "source patient" on whom the needle had originally been used, or follow the medspa's needlestick protocol. The ALJs discussed the evidence and determined that TMB had not established by a preponderance of the evidence that Broder had violated the Act or TMB rules.

In its SOAH complaint filed in March 2019 in Docket Number 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-MD, arising out of a complaint made to TMB in February 2018, TMB accused Broder of misconduct related to Caitlin, designated "Patient Three," and four other patients. TMB alleged that Caitlin died "due to complications" from the liposuction and "fat transfer breast augmentation" performed by Broder in July 2017. TMB alleged that the day after her procedure, Caitlin returned to Broder's clinic complaining of nausea and vomiting. Broder prescribed an anti-nausea medication and a pain medication instead of Tylenol, but the following day, her father called and said she was "very sick, lethargic, continuing to suffer from nausea and vomiting, and had pain radiating through her right breast to her back and right arm." When Broder examined her that night, her breasts "were very red, hard, and had accumulated an excessive amount of watery fluid, but she had normal vital signs and no fever." TMB explained that necrotizing fasciitis "usually presents with severe pain, erythema, edema, tightness of tissues, fever, lethargy, nausea and vomiting" and that Caitlin exhibited "all of these symptoms, except a fever." However, TMB alleged, Broder instead diagnosed Caitlin with fat necrosis despite the fact that fat necrosis "usually does not occur in the immediate post-operative period." Broder operated again and removed some fat from one breast, but Caitlin's mother called later that night to say Caitlin was vomiting and having pain in her right arm. Broder adjusted Caitlin's pain medication

10

and told her mother to bring her to the emergency room if she continued to have trouble with pain and vomiting. The next morning, Caitlin went to the emergency room, where she was diagnosed with sepsis and an infection and admitted to the intensive care unit. Doctors "recommended emergency surgery for necrotizing fasciitis" and "conducted a surgical exploration," but Caitlin became unstable during surgery. She died about twenty-four hours after she arrived at the emergency room, and an autopsy found "multiple surgical puncture wounds of the anterior torso," which TMB stated were caused by Broder, and that Caitlin "had been in a toxic shock-like clinical state in the days following" the procedure. TMB alleged that Broder's "misdiagnosis of fat necrosis resulted in an unnecessary surgical procedure to remove the recently transplanted fat and delay in treatment for complications that ultimate[ly] caused" Caitlin's death and that because of Broder's delay, Caitlin "was in severe sepsis and toxic shock syndrome that was unresponsive to surgery, antibiotics, vasopressors, fluids, and steroids" once she arrived at the emergency room.

In addition to the allegations related to Caitlin, TMB leveled accusations of misconduct related to four other patients. TMB alleged that while "Patient One" was under the influence of several sedatives for a procedure performed in January 2018, Broder obtained her signature on a consent form for an additional procedure and "had his Staff retrieve Patient One's credit card from her purse and run it for approximately $1,000"; TMB alleged that the patient "has no memory of agreeing to the procedure and charges." TMB alleged that when "Patient Two" was treated in July 2016, Broder inadequately documented the procedure, post-procedure care instructions, and follow-up. It alleged that although "Patient Four" had a "severe adverse reaction" as a result of a drug interaction during her August 2017 procedure, Broder "abandoned Patient Four and his Staff to run errands" while the reaction was occurring, texting his staff once

11

to check on the patient. Finally, TMB alleged that "Patient Five" "became unresponsive" when she returned to Beleza Medspa for post-operative care the day after her January 2018 procedure, that Broder was not present for most of that time, that nursing staff stabilized the patient with IV fluids and oxygen, and that the patient was eventually taken by emergency medical services to a local emergency room. TMB also alleged that Broder had violated applicable standards in his delegation of prescription-writing authority to several employees; allowed unqualified non-medical personnel to perform cosmetic procedures and provide training; improperly stored or disposed of controlled substances and medications; and improperly stored patient medical records. Finally, TMB alleged that during a time when he lacked a sufficient number of nurses and under the pretense of interviewing nurse candidates, Broder held "working interviews," having the candidates assist him for full days without compensation and without confirming their credentials and allowing the candidates to observe protected patient information in violation of HIPAA and without disclosing to the patients that the nurses were interviewees.

In relevant part, Broder's affidavit included the following statements:

- Broder has been licensed for twenty-four years, has three years of advanced surgical training, and is board certified in family medicine. He has been performing cosmetic surgery since 2008 and has operated on more than 3,000 patients. He has a nationally accredited "office based surgical suite," and his practice, Beleza Medspa, has four offices in four cities with more than twenty staff members. Broder hired a doctor to assist him in 2015 but later that year "discovered fraud and theft by the physician."

- In July 2017, Caitlin "developed a post-operative infection requiring hospitalization," and Broder averred that he "went to the hospital and advocated for the hospital staff to provide rapid diagnosis and treatment." At the time of Caitlin's death, Broder "had not had any patients ever be hospitalized, let alone pass away."

- On October 2, 2017, Broder received an email from Barr asking for an interview "regarding a pending 'News Investigation' he was conducting regarding" a TMB complaint filed against Broder at SOAH. "There was no mention of any patients." Through his attorney, Broder declined Barr's request for an interview, and Barr

12

responded that he knew the TMB filings "are only accusations at this point" and that his goal was to include Broder's side of the story in the reporting.

- At the time he received Barr's email, Broder "was engaged in Civil litigation with multiple ex-employees who were terminated from [his] practice for fraud and theft." Broder averred, "Coincidentally, these same ex-employees were the complainants in the SOAH complaint," and, "Unsurprisingly, no such complaints were made by these employees prior to [Broder] terminating and then suing them. The majority of these complaints were dismissed or closed, except one to the TMB." Broder also said that "[i]n a further coincidence," Broder's deposition—scheduled for the next day—"was mysteriously cancelled" by opposing counsel "hours before Barr's email arrived."

- On the morning of October 6, 2017, as Broder got out of his vehicle at his office, Barr "violently thrust a microphone into my face. I was shocked and taken aback by his aggressiveness and I became angry in defense." Barr yelled Caitlin's name, and that was the first time Broder realized Barr knew anything about Caitlin. Because of privacy laws, Broder could not even acknowledge that Caitlin was his patient, and Broder considered Barr's "'ambush' a malicious and unethical conduct by Barr, especially given that my attorney and I had already declined any comment" on the matter. "At the time of the ambush, there was no way that Barr would have known" Caitlin's name. However, Broder averred, Dr. Ned Snyder, the president of a local society that "represent[s] direct competitors of [Broder's] practice" and "a major contributor and advertiser at KXAN[,] had accessed the records from Seton prior to Barr's public ambush."

- On November 29, 2017, Barr emailed Broder again, attaching Caitlin's autopsy report, which had been finalized a week earlier and which Broder stated was not public record. Barr told Broder that Caitlin's case would be part of the news report and again asked Broder to do an interview to explain his "side of this case." Broder "became suspicious on how Barr could have known Caitlin's name in the first place," and Broder stated that "there was no case investigation regarding this matter, so it was odd that Barr wanted to interview [Broder] regarding a 'case' that [Broder] was unaware existed."

- On January 4, 2018, Broder received a complaint related to Caitlin from TMB. Broder stated, "[O]ddly, this complaint came after Barr told me I was being investigated. The only person that is aware of an investigation at the TMB prior to the physician being notified is the individual that files the actual complaint." On January 22, Barr told Broder's outside media consultant that he was waiting on "one piece of information" before running his story; two days later, Broder canceled a deposition that was scheduled for January 30; and within hours, Barr emailed Broder again to ask for an interview. Broder stated, "It was apparent to me that my cancelled deposition testimony was going to be used by Barr in his news story."

- On February 1, 2018, Broder's attorney sought a presuit deposition of Barr to determine who provided him with Caitlin's medical records. Broder claimed that Nexstar's general counsel responded and "admitted that they have been given information about the

13

disciplinary action involving [Caitlin] but [said] that Barr was about to use public records to determine the identity of the patient."[4]

- On February 9, 2018, Broder received a letter from TMB stating that it was investigating Caitlin's case, and four days later, Nexstar's general counsel informed Broder that KXAN was investigating that complaint. Broder said, "Again, the only person that can access this information is the person who filed the complaint."

- On February 15 and 16, 2018, during its airing of the Winter Olympics, KXAN ran a two-night, four-part story during its news broadcasts titled, "Prolonged investigations of doctors in Texas leave patients in the dark." Broder averred, "The entire story is solely about me, my practice, my SOAH complaint and Caitlin." Broder averred that Barr's story was inaccurate in that Caitlin was not in "extreme pain" after the surgery and was not in pain and showed no signs of a bacterial infection when she was examined at Broder's office the following day. He also stated that there was no evidence that he caused any delay in Caitlin's treatment.

- On May 16, 2018, Broder's attorney wrote to appellees, detailing inaccuracies and allegedly defamatory statements in the story and demanding its retraction. Nexstar responded that "the source was not bound by HIPAA but refuse[d] to disclose the source." KXAN removed the online story soon after it was aired but reposted it about ninety days later.

- In July 2018, TMB amended its SOAH complaint, "removing all of the serious allegations regarding the patient as reported in the news story" and "downgrad[ing] the complaint to just several recordkeeping errors," but "[i]ncredibly, no retraction or correction [was] published by" appellees. In November, Broder informed appellees "of the continuing financial and reputation damage" their story had caused, informing them of the amended complaint and demanding a retraction. Broder averred that SOAH's May 31, 2019 decision "completely exonerating [him] of all allegations brought by the TMB."

- After the story ran in February 2018, Broder said, he was called "murderer" and "unsafe" on social media and he has "been forced to no longer see patients" and "cannot appear in public for fear of embarrassment." He asserted that multiple would-be clients canceled

---

[4] In her response to Broder's attorney, Nexstar's general counsel disputed that KXAN was subject to HIPAA and said that Barr "did not obtain protected health information regarding 'the patient' from any third party." Instead, she asserted, Barr received information that Beleza Medspa's owner had a TMB action pending against him and "had a recent young patient pass away, within a specified 6-day time period." Barr then "undertook the activities we expect of our reporters—that is, reviewing publicly available records (e.g., [TMB] records), reviewing obituaries, requesting information through the Public Information Act, and making outreach to individuals identified through such searches." Counsel added that "any personal information regarding the 'patient' which may be included in the report was provided by the 'patient's' mother and/or used with her consent."

14

their scheduled procedures, costing the practice hundreds of thousands of dollars in losses; several patients "resorted to extortion and blackmail with threats of TMB complaints and 'going to the media' if they were not refunded for procedures"; and the "instability caused by the story induced fear and uncertainty" in the medspa's staff, leading to resignations by "multiple key staff members." Broder stated that his reputation has been permanently damaged. Broder also said he was so shaken by Barr's "ambush" that he decided to stop coming to his Cedar Park office and still suffers from anxiety when he arrives at that office.[5]

- Broder also alleged that TMB "repeatedly" told Barr that it could have suspended Broder's license if it considered him a threat to the public but that Barr's emails "indicate that he refused to believe that [Broder] wasn't a threat to the public"; that Barr's sources "consisted of terminated ex-employees and competitors"; that appellees "could not corroborate any part of their narrative"; that appellees "tack[ed] on" one and a half minutes about TMB's process to the seventeen-minute story about Broder in "a desperate attempt to camouflage their shoddy and malicious work"; that "had the story been about TMB, KXAN would have reported that there is a process to suspend the license of a dangerous doctor and TMB chose not to use that process with" Broder; that Caitlin's protected health information was "trafficked among ex-employees, competitors, attorneys and finally KXAN-TV and Barr to be used expressly for their own personal financial gain and fame"; that every person who "trafficked" Caitlin's protected health information committed an illegal act; that Caitlin's necrotizing fasciitis "was repeatedly misdiagnosed and improperly treated by hospital staff."


Attached to Broder's affidavit were numerous exhibits, including:

- His petition filed in January 2016 against Dr. David Dellinger, the doctor who Broder fired and who filed a TMB complaint in March 2016, Nicole Dellinger, who was Beleza Medspa's practice manager for several months, and their new practice.

- Dellinger's March 2016 letter to TMB alleging misconduct by Broder related to patient safety, HIPAA violations, violations of advertising rules, and improper storage of medical records and TMB's notification letters to Broder related to that complaint (TMB File Number 16-4334).

- TMB's letters notifying Broder that a complaint had been filed in May 2016 (File Number 16-5538), alleging deceptive advertising and unprofessional conduct, and that

---

[5] Beleza Medspa's executive vice-president averred similarly, saying that after the report ran, Beleza had "multiple cancellations" and suffered "a huge loss of business and profits"; that numerous former patients had demanded refunds, threatening to go to the media if their demands were not met; that an employee who performed Botox and similar treatments had quit, causing a loss of revenue; and that the medspa had faced difficulty in hiring new staff.

TMB had closed that complaint in December 2016 because there was no evidence to support the allegations.

- Broder's response letters to TMB in the various investigations.

- A document summarizing complaints filed with TMB in January 2016 (File Number 16-2979) by several former medspa employees, including nurse Valerie Calaway, alleging that aestheticians and nurses were improperly performing procedures and ordering and administering medications, that medications and medical devices were improperly stored, that expired medications were being used on patients, that equipment was in disrepair, that the medspa lacked appropriate arrangements for cleaning contaminated surgical laundry, that medical charts were improperly stored, and that Broder had responded inappropriately after a nurse was stuck with a used needle during a procedure, as well as TMB's January 2016 letter stating that the complaint was closed for lack of sufficient specific information to substantiate the allegations.

- Communications between Barr, Nexstar's general counsel, Broder, and Broder's attorneys, including Broder's attorney's assertion that Dr. Dellinger and other ex-employees were "actively engaged in a libel and slander campaign" against Broder, using TMB "in bad faith," and Barr's response that his report was not part of a conspiracy against Broder and that he had never spoken to Dr. Dellinger.

## TRIAL COURT'S APPLICATION OF THE TCPA

We start with appellants' first argument—that the TCPA does not apply because their legal action was based not on constitutionally protected free speech but on "illegally obtained" protected health information that was then improperly broadcast to the general public. Appellants assert that the record shows that Barr's investigation began after KXAN received Caitlin's protected health information and that "there was no way for the source of the tip to have known about a deceased patient . . . if the person did not have access to the confidential medical records." Furthermore, they contend, the news report itself disclosed Caitlin's protected health information in "excruciating[ly] ample detail," including her name, date of birth, medical procedures, and cause of death. Because KXAN's report was based on "illegally obtained" information, appellants argue, their lawsuit is not subject to the TCPA.

16

In Broder's affidavit, he alleged that Dr. Ned Snyder, a competitor and a KXAN contributor and advertiser, had accessed Caitlin's hospital records and must have "obtain[ed] them for an improper purpose." He also questioned how Barr "could have known Caitlin's name" and said that it "was odd that Barr wanted to interview [Broder] regarding a 'case' that [Broder] was unaware existed." Finally, he stated that KXAN "concocted a cover story about TMB delays" in an attempt to "camouflage their shoddy and malicious" journalism, while focusing the story on Broder, not on TMB and its processes.

However, Barr stated in his affidavit that he began to investigate Broder and the TMB complaint process in September 2017, after KXAN received a "confidential tip that a young patient died after a recent surgery at Beleza Medspa." He stated that the tip did not give any identifying information about the patient and alleged that an unrelated "disciplinary action" was pending against "the physician who performed the procedure." Barr averred that he then reviewed publicly available records, including TMB's records and its SOAH complaint, filed in August 2017. He eventually determined that Broder was the doctor in question and Caitlin was the patient and contacted her family and former Beleza employees. Caitlin's mother cooperated with Barr's reporting, stating that she and Caitlin were unaware of the pending TMB complaint and that she believed Caitlin "would not have undergone the procedure had she known" about it. Although he implies that Barr was given Caitlin's protected health information in violation of HIPAA laws, Broder has not established that fact—and Barr averred to the contrary, insisting that the tip did not include any protected information—nor has he established that Barr's inclusion of some of Caitlin's health information in the news report was improper or in violation of HIPAA, an assertion belied by the fact that Caitlin's family participated in Barr's

17

investigation and news report.  *See* 45 C.F.R. §§ 164.502(g)(4), .508 (person with authority to act on behalf of deceased person may authorize disclosure of protected health information).

Even if Broder had established that Barr was improperly given Caitlin's protected health information, the TCPA would still apply.  The TCPA applies to a legal action "based on," "relat[ing] to," or "in response to" the exercise of the right of free speech, defined as "a communication made in connection with a matter of public concern."  Former Tex. Civ. Prac. & Rem. Code §§ 27.001(3), .003(a).  "[T]the provision of medical services by a health care professional constitutes a matter of public concern."  *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 510 (Tex. 2015).  Other than alleging impropriety surrounding the disclosure of Caitlin's protected health information, appellants do not challenge whether appellees established by a preponderance of the evidence that the lawsuit was based on, related to, or in response to appellees' right of free speech.  And, indeed, the report was about TMB's complaint against Broder and about TMB's complaint process, how long that process takes, and the fact that patients have no way of knowing about pending TMB complaints until TMB decides to file a complaint, which are all matters of public concern touching on issues of public safety, health, community well-being, governmental process, and services provided in the marketplace.  *See id.*; *see also* former Tex. Civ. Prac. & Rem. Code § 27.001(7) (defining "matter of public concern").

The TCPA exempts from its reach certain actions but does not include an exclusion related to the disclosure of protected health information.  *See* former Tex. Civ. Prac. & Rem. Code § 27.010.  Nor does the TCPA exclude speech that arises out of an improper act committed not by the person exercising the right of free speech—here Barr and KXAN, who acted in coordination with Caitlin's family in reporting some of her protected information—but

by someone else—allegedly the tipster.[6]  The trial court properly determined that the TCPA applies to appellants' lawsuit.  We therefore overrule appellants' first issue on appeal.

Appellants next argue that the trial court's application of the TCPA was constitutionally overbroad, noting that the right to sue for defamation is constitutionally protected and arguing that the dismissal of their suit undermines the intent of the TCPA.  They argue that their lawsuit "is not the frivolous type of suit the TCPA seeks to limit," that the news report was "harassing and defamatory" and has caused appellants emotional and financial harm, and that the report "used improperly obtained [protected health information] to make false accusations about Dr. Broder's standard of care."  They argue that the media should not be allowed to "target an individual and make objectively false and misleading statements" or to "spew falsities for the purpose of furthering an agenda."

"[T]he Texas Constitution expressly guarantees the right to bring reputational torts."  *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 117 (Tex. 2000) (citing Tex. Const. art. I, §§ 8 (person has right to "speak, write or publish his opinions on any subject, being responsible for abuse of that privilege"), 13 (courts are open to person for injury done to reputation)).  We agree with Broder that a party may not make "objectively false and misleading statements" or "spew falsities" in an effort to harm another.  And, indeed, if a party believes he has been defamed by another, he may sue for damages, provided he can defend against a TCPA motion by presenting sufficient clear and specific evidence that would entitle him to recover on his claims in the absence of proof to the contrary.  *See Serafine*, 466 S.W.3d at 358.

---

[6] Broder may be dismayed at the disclosure of Caitlin's protected health information, but it was for Caitlin's family, who presumably had the authority to act on her behalf or on behalf of her estate, to determine whether such information should be released, and there is no indication that they believe Barr overstepped or erred in his inclusion of some of her protected information in the news report.  *See* 45 C.F.R. § 502(g)(4).

19

Thus, the framework of the TCPA, requiring a claimant to present a prima facie case for the elements of his claims, allows a party to seek damages for reputational torts, as guaranteed by the Texas Constitution, while protecting defendants from frivolous claims. Appellants have not established that the trial court's application of the TCPA, which simply required them to establish that their suit is not frivolous, infringed on their right to seek damages for reputational torts committed by appellees. We overrule appellants' second issue.

## PRIMA FACIE CASE

We next consider whether appellants established by clear and specific evidence a prima facie case for each element of their claims. *See* former Tex. Civ. Prac. & Rem. Code § 27.005(b), (c); *Coleman*, 512 S.W.3d at 898; *Lipsky*, 460 S.W.3d at 586. "Prima facie evidence is evidence that, until its effect is overcome by other evidence, will suffice as proof of a fact in issue. In other words, a prima facie case is one that will entitle a party to recover if no evidence to the contrary is offered by the opposite party." *Serafine*, 466 S.W.3d at 358 (cleaned up). "Bare, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA." *Lipsky*, 460 S.W.3d at 592; *see Serafine*, 466 S.W.3d at 358 ("Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case."). "[T]he term 'clear and specific evidence' refers to the quality of evidence required to establish a prima facie case, while the term 'prima facie case' refers to the amount of evidence required to satisfy the nonmovant's minimal factual burden." *Serafine*, 466 S.W.3d at 358.

<u>*Defamation and Business Disparagement*</u>

The elements of a defamation claim are "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, and (3) was made with the requisite degree of fault." *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019). A business-disparagement claim also involves a showing of falsity: the plaintiff must establish that the defendant published false and disparaging information with malice and without privilege, causing the plaintiff special damages. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003). "A business disparagement claim is similar in many respects to a defamation action," differing in the interests they protect—personal reputation versus economic interests. *Id.*

> [A] private individual who sues a media defendant for defamation over a report on official proceedings of public concern has the burden of proving that the gist of the report was not substantially true—that is, that the report was not a fair, true, and impartial account of the proceedings. That burden is not met with proof that the report was not a substantially true account of the actual facts outside the proceedings.

*KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 715 (Tex. 2016). In other words, "[t]he media enjoy a privilege to report on judicial and official proceedings without regard for whether the information from such proceedings is actually true." *Hall*, 579 S.W.3d at 381.[7] The defendant

---

[7] In chapter 73, titled "Libel," section 73.002, titled "Privileged Matters," provides:

> (a) The publication by a newspaper or other periodical of a matter covered by this section is privileged and is not a ground for a libel action. This privilege does not extend to the republication of a matter if it is proved that the matter was republished with actual malice after it had ceased to be of public concern.

21

must prove that the media privilege applies, but the plaintiff bears the burden of proving that the report was false. *Id*. at 380. "Similarly, a media outlet that accurately reports allegations made by a third party about matters of public concern can assert the truth as a defense,"[8] and the plaintiff bears the burden under the TCPA to show the falsity of the reporting. *Id*.

"To not be false, a statement need not be perfectly true as long as it is substantially true." *Id*. at 377 (cleaned up). However, "even if a publication 'gets the details right but fails to put them in the proper context and thereby gets the story's "gist" wrong,' it may be liable for defamation." *Id.* at 380 (quoting *Turner*, 38 S.W.3d at 115). In such a case—when "true statements strung together and accompanied by speculative commentary might wrongly

(b) This section applies to:

(1) a fair, true, and impartial account of [most judicial proceedings, official proceedings to administer the law, executive or legislative proceedings, and public meetings dealing with a public purpose]; and

(2) reasonable and fair comment on or criticism of an official act of a public official or other matter of public concern published for general information.

Tex. Civ. Prac. & Rem. Code § 73.002(a).

[8] Section 73.005, titled, "Truth a Defense," provides:

(a) The truth of the statement in the publication on which an action for libel is based is a defense to the action.

(b) In an action brought against a newspaper or other periodical or broadcaster, the defense described by Subsection (a) applies to an accurate reporting of allegations made by a third party regarding a matter of public concern.

*Id*. § 73.005 (a), (b). Although appellants state that the Texas Supreme Court "specifically disclaimed" a defense related to the accurate reporting of third-party allegations in *Neely v. Wilson*, 418 S.W.3d 52, 64-65 (Tex. 2013), they fail to observe that the legislature has since added subsection (b), thus shielding media defendants from libel liability for publishing third-party allegations, *see Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 791-92 (Tex. 2019) (noting that legislature amended section 73.005(b) in 2015).

imply that the subject of a publication has committed a crime"—the plaintiff must demonstrate how the defendant's statements implied the plaintiff's guilt. *Id*. at 380-81; *see Turner*, 38 S.W.3d at 115 (defamation claim may lie "when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way"). Thus, in suing "based on a defamatory implication—whether a gist or a discrete implication," the plaintiff has the burden of pointing to "additional, affirmative evidence within the publication itself that suggests the defendant intends or endorses the defamatory inference." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 635 (Tex. 2018) (cleaned up). The evidence of intent must be found in the news report itself, evaluated as a whole rather than by focusing on individual statements. *Id*. The intent inquiry is objective—the defendant's actual, in-fact intent is not relevant, and the plaintiff must show that "the publication indicates by its plain language" an intention to convey the defamatory meaning. *Id*. at 635-36.

In the trial court, appellants pointed to several specific statements, which they asserted were presented "as affirmative, objectively verifiable facts that Dr. Broder could have been stopped by the TMB, before his unsafe and deficient care of patients caused the death of a young woman": "Medical Board delay could have caused Caitlin her life"; "You don't know about your doctor until it's too late"; "Did the [TMB] do enough to protect the general public, but to protect your daughter specifically," asked of Laura during her interview; and, "Meanwhile, under Texas law, Broder is permitted to continue to practice." Appellants also asserted that the following statements were factually false and "carefully designed to make the care of the patient appear deficient and unsafe and that Dr. Broder was undoubtedly the cause of her death":

23

- Caitlin went to Beleza "to have fat removed from her abdomen and then used to reshape one of her breasts." Appellants noted that the procedure was on both breasts and involved liposuction of five other areas, "indicating that the procedure was less likely the source of the infection."

- Caitlin and her mother "were sent home that afternoon with a prescription and [wound care] instructions." Appellants noted that Caitlin actually received three prescriptions, including one for an antibiotic, and that she was seen the next morning, "where she was doing well."

- "The next day she complained of severe pain in her arm and shoulder said Laura." Appellants asserted that Caitlin "did not complain about arm pain until 48 hours after procedure."

- "Despite aggressive therapy at the hospital, ER doctors couldn't save her life." Appellants noted that Caitlin was admitted to hospital and died thirty-six hours later, not in the emergency room.

- "Around March of 2016, a doctor who was fired by Broder filed a complaint with the TMB accusing him of violating multiple sections of the state's Medical Practice Act." Appellants noted that the doctor "was fired before he filed complaint in retaliation."

- Statements about the patient who was the subject of the referenced TMB complaint— "She lost consciousness. She turned blue, was unresponsive. The patient is awake during the whole procedure, so nobody should be losing consciousness," and "[m]ore pain than any other patient." Appellants asserted that "many of these statements were not included in the SOAH complaint and were not identified as such." With regard to that same patient, the news story also said, "That patient survived," and appellants stated that there was "no indication that the patient's life was at risk."

- "Last night we showed you, it can take up to a year to close a case and make doctor misconduct public." Appellants argued that because "Dr. Broder was the only 'case' mentioned" the night before, the statement led viewers "to believe that his case was 'closed' and 'misconduct' against Dr. Broder was proven." Instead, they insisted, "the case consisted of unsubstantiated allegations that were not proven or even litigated. Yet, Dr. Broder is directly accused of 'misconduct.'"

- "Because any of us can be a patient [like Caitlin] who had no idea her doctor was under investigation before she went under the knife." Appellants asserted that the story again linked "the unrelated SOAH investigation" to Caitlin's death.

In addition to complaining of those specific statements, appellants alleged that there was no discussion or evidence of "any other delayed investigations," a fact that shows that

24

"the story was in all regards" about Broder and his patients and "not about TMB 'delays' and other patients." They further asserted that the news report included "false assertion[s]," "unsupported by any evidence," that TMB investigations are 'prolonged'" and that patients are "kept in the dark or complaints [are] kept quiet." Finally, appellants argued that Broder's license was never at risk of suspension, so, "[o]bviously, the allegations in Dr. Broder's TMB complaint did not involve him being a 'continuing threat to the public welfare'"; that appellees used "[b]iased editing" to "create further defamation" by editing "unrelated" statements together in such a way to make it appear that Caitlin's mother "was questioning 'Why?' the 'severe pain', and implying it was why she died"; and that appellees "conveniently omit[ted]" explanations that Caitlin's procedure was on seven areas and that she only developed an infection in one area, that she was doing fine when seen the morning after the procedure, that she was on antibiotics before and after the procedure, that Broder surgically intervened when Caitlin reported pain two days later, and that Broder "spent 30 hours in the hospital trying to save her" and was "the only physician involved in her case that made the correct diagnosis."

Appellants' argument in this Court focuses less on the specific statements made in appellees' news story and more on the "gist" of the story, which they argue is that Broder is an unsafe doctor whose deficient care caused Caitlin's death. For support, they point to Laura Duvall being asked whether TMB did enough to protect Caitlin and the general public and the statements that TMB "could have caused the patient her life," that a patient does not know about their doctor "until it's too late," that Broder was permitted to continue to practice medicine while TMB investigated, that a fired doctor filed a complaint against Broder in 2016, that Caitlin was sent home with a prescription and wound-care instructions, and that she complained of pain the next day. Appellants argue that the average viewer or reader would have and in fact did

25

conclude that Broder was unsafe and should have been stopped by TMB before Caitlin's procedure and subsequent death, a gist that they argue was substantially untrue and defamatory.

The specific statements that appellants discuss as adding up to an untrue gist that Broder was an unsafe doctor are substantially true, taken from TMB's August 2017 complaint, or made by third parties during interviews with appellees: in about March 2016, Dr. Dellinger filed a TMB complaint accusing Broder of violating the Act; Broder had fired Dellinger; Broder was allowed to continue practicing while TMB conducted its investigation; TMB's investigation took more than a year and resulted in its August 2017 SOAH complaint; Caitlin, whose surgery occurred before the SOAH complaint was filed, was sent home with prescriptions and wound-care instructions;[9] Laura stated that Caitlin started complaining of severe pain in her arm and shoulder the day after surgery; and the allegations that Patient One complained of severe pain, "turned blue," and became unresponsive during her 2016 procedure were contained in TMB's complaint or made by Ryan Harlan, the aesthetician who assisted in the surgery.

It is true that the news report discussed Caitlin's death alongside the allegations made in TMB's unrelated SOAH complaint, the amount of time it took TMB to investigate and file the complaint against Broder, and the time involved in the TMB process in general. However, the report's statements about Caitlin and TMB's complaints against Broder are substantially true—the TMB process as to Dellinger's complaint did take more than a year to result in a SOAH complaint. Caitlin's autopsy did state that she died as a result of complications from her plastic-surgery procedure. Caitlin did undergo surgery at a time when Dellinger's complaint was under investigation and TMB had not yet filed its public SOAH complaint. Her

---

[9] Whether Caitlin was sent home with one or three prescriptions does not weigh on whether the news story was substantially true.

26

mother did state that Caitlin would not have undergone the procedure if she had known about the complaint. Further, appellants did not show inaccuracy or falsity in appellees' reported information related to the number of complaints filed with TMB, the percentage that lead to SOAH complaints, and the length of time the investigations take on average. Although Broder averred that he was not responsible for Caitlin's death, that statement does not bear on whether appellees provided a substantially true report *about the overall TMB complaint and investigation process, Broder's specific TMB complaint, or Caitlin's death.*

The trial court did not err in determining that appellants had not made a prima facie showing that the gist of the report was materially false or that appellees had a defamatory intent in making the report. Thus, the trial court properly dismissed appellants' claims for defamation and business disparagement. We overrule appellants' third and fourth issues.

*Tortious Interference with a Contract and Tortious Interference with Business Relationships*

"Interference with a contract is tortious only if it is intentional." *Southwestern Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992). "Justification is an affirmative defense to tortious interference with contract and tortious interference with prospective business relations," and "the justification defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Prudential Ins. Co. of Am. v. Financial Rev. Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000); *see Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996) ("Even if a plaintiff establishes the elements of this cause of action, a defendant may still prevail upon establishing the affirmative defense of justification."). However, "[t]he scope of free speech protection does not depend on the legal theory asserted by an inventive plaintiff,"

*Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 733 (Tex. App.—Houston [14th Dist.] 2013, pet. denied), *disapproved on other grounds by Lipsky*, 460 S.W.3d 579 (cleaned up), and, therefore, "[w]hen a non-libel claim is grounded on the same speech giving rise to a libel claim, a plaintiff must prove the falsity of the alleged libelous speech," *Evans v. Dolcefino*, 986 S.W.2d 69, 79 (Tex. App.—Houston [1st Dist.] 1999, no pet.), *disapproved on other grounds by Turner*, 38 S.W.3d at 115-16. "To hold otherwise would permit litigants to circumvent constitutional defenses against the tort of libel by pleading torts that do not require falsity or actual malice." *Id*.

Appellants' claims for tortious interference with a contract and with business relationships are grounded in their defamation claim, and appellees established truth as a defense to the defamation claim. Thus, it follows that the related tort claims must also fall and that the trial court properly granted appellees' motion to dismiss appellant's claims for tortious interference. *See Bird v. W.C.W.*, 868 S.W.2d 767, 772 n.7 (Tex. 1994) ("it would be ironic if an individual could avoid all the constitutional restrictions on defamation actions merely by disguising such claim in negligence terms"); *Evans*, 986 S.W.2d at 79.[10] We overrule appellants' fifth and sixth issues.

---

[10] *See also, e.g.*, *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 733 (Tex. App.—Houston [14th Dist.] 2013, pet. denied), *disapproved on other grounds by In re Lipsky*, 460 S.W.3d 579 (Tex. 2015) First Amendment protections from libel claims also protect defendants from non-libel claims based on same publication); *Laub v. Pesikoff*, 979 S.W.2d 686, 691-92 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (when "essence" of claims for libel and slander, intentional interference, civil conspiracy, intentional infliction of emotional distress, negligence, and constitutional violations are injury due to alleged defamation during judicial proceeding, claims are all barred by judicial-communications privilege); *Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467, 474 (Tex. App.—Dallas 1994, writ denied) (non-libel claims were grounded on libel claim, and thus, "to recover on the non-libel claims, Rogers had to prove the falsity of the alleged defamatory articles").

## ATTORNEY'S FEE AWARD

In their seventh issue, appellants complain of the trial court's award of attorney's fees. Appellants first assert that the TCPA's provision requiring the mandatory award of attorney's fees is unconstitutional because it violates the open-courts provision of the Texas Constitution. *See* Tex. Const. art. I, § 13. However, as appellees note, appellants did not raise that challenge in the trial court, and thus, appellants' issue related to the constitutionality of the TCPA's mandatory attorney's fees provision is not preserved for our review. *See Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 222 (Tex. 2002) ("A litigant must raise an open-courts challenge in the trial court."); *Texas Dep't of Protective & Reg. Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) ("As a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal." (cleaned up)); *Baumgart v. Archer*, 581 S.W.3d 819, 831 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (party "did not raise these constitutional challenges in the trial court, and therefore they are not preserved for our review"); *Pruski v. American Med. Response, Inc.*, No. 03-17-00717-CV, 2018 WL 6056936, at *3 (Tex. App.—Austin Nov. 20, 2018, pet. denied) (mem. op.) ("Because Pruski did not make this argument to the trial court, she cannot now raise it for the first time on appeal.").[11]

---

[11] Our sister courts in Houston have considered this or similar challenges and have ruled that the TCPA's attorney's fees provision does not violate the Texas Constitution. *See Gensetix, Inc. v. Baylor Coll. of Med.*, 616 S.W.3d 630, 649-50 (Tex. App.—Houston [14th Dist.] 2020, pet. dism'd) (mem. op.) (TCPA's conditional appellate fee awards "do not create an impermissible pay-to-play barrier to the courts; the awards shift litigation costs after resolution of a claim"); *Memorial Hermann Health Sys. v. Khalil*, No. 01-16-00512-CV, 2017 WL 3389645, at *17 (Tex. App.—Houston [1st Dist] Aug. 8, 2017, pet. denied) (mem. op.) (TCPA includes limits on "the duration of fee accumulation and therefore the amount of fees that might be imposed on a party under the TCPA, provide the trial court with discretion in determining fee and sanction awards, and establish a mechanism to shift fees to those who would abuse the TCPA procedures," and holding that "the fee-award provision is not unreasonable or arbitrary when balanced with the statute's purpose and does not violate the open-courts doctrine").

Appellants also argue that the award itself was unreasonable and not based on sufficient evidence. A successful movant under the TCPA is entitled to "reasonable attorney's fees," former Tex. Civ. Prac. & Rem. Code § 27.009(a)(1), which are fees that are "not excessive or extreme, but rather moderate or fair," *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010). We review a trial court's determination of reasonableness for an abuse of discretion. *Sullivan*, 488 S.W.3d at 299; *Hawxhurst*, 550 S.W.3d at 232.

The Texas Supreme Court has explained that in "determining the reasonableness and necessity of attorney's fees in a fee-shifting situation," a trial court should employ two steps, first determining "a base lodestar figure based on reasonable hours worked multiplied by a reasonable hourly rate," and then adjusting the base lodestar up or down if relevant factors require such an adjustment. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 501 (Tex. 2019). The factors that may require adjustment are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to properly perform the legal service; (2) the likelihood that the subject employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyers performing the services; and (8) whether the fee is fixed or contingent. *Id*. at 494. However, "considerations already incorporated into the base calculation may not be applied to rebut the presumption that the base calculation reflects reasonable and necessary attorney's fees." *Id*. at 501.

"Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were

performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id*. at 502. "General, conclusory testimony devoid of any real substance will not support a fee award," and a claimant seeking attorney's fees must "prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought." *Id*. at 501-02; *see also Sullivan*, 488 S.W.3d at 299 (party seeking attorney's fees bears burden of proof and must at minimum establish services performed, who performed them and when, hourly rate, and how much time was required).

Two weeks after the trial court signed its order granting appellees' motion to dismiss, appellees filed an affidavit by attorney Catherine Robb. Robb attached redacted invoices between February and June 2019, stated that appellees had incurred $124,357 in attorney's fees and $6,498 in costs and expenses, and asserted that appellees should recover conditional appellate attorney's fees of $40,000 for an appeal to this Court, an additional $10,000 for a petition for review in the Texas Supreme Court, and an additional $50,000 for a granted petition for review. Six days later, the trial court signed an order awarding appellees $119,752 in attorney's fees, costs, and expenses, along with conditional appellate attorney's fees. Appellants challenged the award, arguing that it was excessive and unreasonable; that the trial court had not given appellants "a meaningful opportunity to respond, object, or submit evidence of their own before trying the issues by affidavit"; and that the trial court had improperly lumped attorney's fees, costs, and expenses together into a single award. After a hearing on appellants' challenge, the trial court vacated its order, provided deadlines for both sides to submit evidence and objections, and set the issue of attorney's fees for a hearing.

31

After that second hearing, the trial court signed a new order, awarding appellees $113,510 in attorney's fees, costs, and expenses, along with conditional appellate fees ($25,000 for an appeal to this Court, $5,000 for a petition for review filed in the supreme court, and $30,000 if the supreme court granted the petition). The trial court also signed an order clarifying the award, explaining that it had determined the reasonable hours and rates billed by each member of the legal team. The court accepted the team's hours and rates asserted by Robb except that it lowered the associate's hours from 81.9 to 64.9 and his hourly rate from $400 to $350. The court ruled that appellees' total reasonable attorney's fees were $112,217.50 and that their court costs and expenses were $1,292.50.

Appellants argue that Robb's affidavit "failed to identify which attorney conducted how much of the work for each task" and "neglected to identify whether any of the attorney's fees were duplicative." They also assert that the monthly invoices were "too redacted to identify exactly what tasks were completed or if any of the work was duplicative or excessive," and that the invoices did not indicate which specific claim each entry of work was for. Further, appellants note that "there is no allegation in the affidavit of the amount at stake in the dispute, which made it impossible for the trial court to award attorney's fees proportionate to the amount at stake." In all, appellants insist, the trial court was "unable to determine reasonable attorney's fees based on" Robb's affidavit and attachments and thus abused its discretion in making its award, citing *Toledo v. KBMT Operating Company, LLC*, 581 S.W.3d 324 (Tex. App.—Beaumont 2019, pet. denied), and asserting that the evidence presented in that case—found to be wanting by the court of appeals—was similar to the evidence presented here.

In *Toledo*, the trial court granted the full $256,689 that KBMT had requested. *Id.* at 331. KBMT's motion for attorney's fees was supported by 177 pages of bills and an affidavit prepared by its lead attorney, Michael McCabe, which:

> describes his professional experience, his role as lead counsel in the case, and identifies the other attorneys who participated in defending KBMT from Toledo's claim together with each attorney's and paralegal's hourly rates. McCabe's affidavit describes the course of the litigation. He summarized the firm's invoices by date and the total attorney's fees billed by date of invoice. In his affidavit, McCabe states the fees charged to KBMT are the usual and customary fees for the work the attorneys completed. He also stated the fees were reasonable and necessary for the case.

*Id.* at 328. In determining that the award was an abuse of discretion, the court of appeals stated that McCabe's testimony about the hours worked by the legal team was "rather conclusory" and observed that the billing records indicated that "many attorneys work[ed] on the case, each billing many hours to prepare for what appear from the descriptions to constitute work on the same documents and briefs," and that McCabe did not adequately explain "why the attorneys who billed KBMT for working on the case were not needlessly duplicating and revising each other's work." *Id.* at 331. The court also stated that the trial court had "failed to establish the amount at stake in the dispute"—"whether Toledo was suing KBMT for ten thousand dollars or one million dollars"—and that without that information, "a trial court may mistakenly award fees that are disproportionate to the amount at stake." *Id.* at 331-32. The court observed that the case did not involve "much discovery" or go to trial—instead, the attorneys' work "revolved around a motion to dismiss and two appeals," and the issues involved were not matters of first impression but simply required "the application of existing well-settled law" to the facts. *Id.* at 332. The

33

court concluded that the trial court had not applied the lodestar method properly and had abused its discretion in making its award of attorney's fees. *Id*. at 333.

Robb averred that she had spent 123 hours working on the case, that a partner at her firm had performed 43.6 hours of work, that an associate had performed 81.9 hours of work, and that a paralegal had performed 26.7 hours of work; she also provided each team member's hourly rate—$475 for Robb, $575 for the partner, $400 for the associate, and $225 for the paralegal. Robb stated that she had considered the factors set out in *Rohrmoos Venture*, 578 S.W.3d at 494, and included discussions of each factor. Robb described the tasks performed by the lawyers and paralegal—drafting correspondence; writing and reviewing pleadings, briefs, motions, responses, and other filings; investigating and evaluating appellants' claims and appellees' defenses; researching "various issues raised in this matter," including appellants, TMB procedures, and the "rapidly evolving area" of the TCPA; and preparing for and attending hearings and arguments. Robb also listed the hours the legal team as a whole spent on various tasks—for example, more than forty hours reviewing and analyzing the complaint and preparing the answer, more than one hundred hours preparing appellees' motion to dismiss, almost forty hours preparing the motion to strike, and about forty hours preparing for hearings.

As for the difficulty or complexity of the work, Robb stated that appellants' petition was more than forty pages long, contained multiple causes of action, and "failed to clearly articulate the complained-of statements or the reasons why such statements were allegedly false and defamatory," meaning appellees' legal team had "to spend considerable time and resources attempting to respond to the vague and unclear allegations and to attempt to ensure they were addressing every possible basis for claimed relief." In addition, she said, appellants' "multiple (and voluminous)" filings leading up to the TCPA hearing—including an "over nine-

34

hundred-page" response and an untimely motion for continuance—"significantly increased" appellees' fees, stating that the time required to analyze and respond and object to appellants' TCPA evidence cost about $15,000 in additional attorney's fees and that appellees' response to appellants' "last-minute motion for discovery and for continuance" cost another $2,000.

Robb stated that the rates charged to appellees were "comparable to or lower than rates charged by legal professionals with similar levels of experience at similar law firms in the Central Texas area, including Travis County, for highly specialized First Amendment work such as the work performed for the Defendants in this case." She concluded that in her professional opinion, appellees should be awarded a total of $124,357 in attorney's fees, $6,498 in costs and expenses, and conditional appellate attorney's fees of $40,000 for an appeal to this Court, an additional $10,000 for a petition for review in the Texas Supreme Court, and an additional $50,000 for a granted petition for review. Robb attached to her affidavit appellees' monthly invoices from February through June 2019. Those statements list the lawyer or paralegal who performed the work, the date of the work, the amount of time spent, and a general description of the work performed (with certain details redacted).

Although appellants insist that this case is akin to the facts presented in *Toledo*, a comparison of that case and the record here does not bear that out. This case involved an original petition that was more than forty pages long; appellants' twenty-page answer and special exceptions; a forty-page motion to dismiss, which was answered with a more than one-hundred-page response and hundreds of pages of attachments; dueling objections to the TCPA evidence; and various other motions and hearings. Robb's affidavit is not conclusory. *See Toledo*, 581 S.W.3d at 331. The trial court did not simply award the full amount sought by appellants and

instead held two hearings related to attorney's fees, vacated its initial order, and signed a new order, lowering the attorney's fee award by about $6,000 to $113,510. *See id*. at 330.

Unlike *Toledo*, it is not clear from the invoices that the attorneys were performing duplicative work. *See id.* at 331. The invoices are redacted, but not so heavily that they cannot be looked to as verification of the kind of work performed, the legal professional who performed it, and the amount of time it took. And although the invoices do reflect that the associate spent considerable hours drafting certain pleadings that were then reviewed and reworked by the more senior attorneys, the trial court struck seventeen hours of the associate's billed time and lowered his recoverable rate to $350.

In addition, Robb averred that appellants had employed tactics that increased the time required to be spent, filing objectionable and inadmissible evidence, an untimely motion for continuance, a "last minute Motion for Discovery," and "voluminous" filings. The record shows that appellants filed their TCPA response and accompanying hundreds of pages of evidence five days before the hearing on the motion to dismiss (and two months after appellees filed their motion to dismiss).[12] On that same day, appellants also filed a motion for continuance and for additional discovery, *see* former Tex. Civ. Prac. & Rem. Code § 27.006(b) ("On a motion by a party or on the court's own motion and on a showing of good cause, the court may allow specified and limited discovery relevant to the motion."), leading the trial court to ask at the hearing why appellants had waited until mere days before the hearing to seek to depose Barr.

---

[12] Appellees then filed objections to multiple items of that evidence, the majority of which were granted by the trial court.

36

It is true that appellants' pleadings do not specify a damages amount,[13] but they sought compensatory damages, punitive damages, and damages for loss of business, lost wages, and mental anguish. They also filed an affidavit alleging that an employee who had brought in over $800,000 in annual revenue had quit and could not be replaced, that Broder had generated about $170,000 a month before the story ran but was no longer generating revenue, and that cancelations after the story ran led to reduced profits of over $10,000 a month—those alleged losses alone would have amounted to approximately $4,000,000 from February 2018, when the story ran, through the summer of 2019, when the trial court issued its dismissal order and its first order on attorney's fees. It is fair to assume that the overall damages asserted by appellants, including punitive and mental-anguish damages, would be considerably higher. And, because the trial court dismissed all of appellants' claims, a decision we have upheld, the fact that appellees' evidence on attorney's fees did not specify exactly what claim was being worked on at any given time does not require reversal of the overall award.

Considering the entire record and the law on attorney's fees as set out by the Texas Supreme Court, *see Rohrmoos Venture*, 578 S.W.3d at 494, we cannot conclude that the trial court abused its discretion in its award of attorney's fees. We therefore overrule appellants' seventh issue.

---

[13] Indeed, appellees filed special exceptions complaining of that deficit.

## CONCLUSION

We have overruled each of appellants' issues. We therefore affirm the trial court's orders dismissing appellants' claims under the TCPA and awarding attorney's fees to appellees.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   June 4, 2021